BLACK *v.* BLACK, et al.

In Banc.   June 12, 1950.

No. 37398 (46 So. (2d) 805)

A. D. Somerville and Robert E. Nason, for appellant.

**Dugas Shands**, for appellees.

**Lee, J.**

I. T. Black brought suit in June, 1948, against C. F. Black and wife, E. F. Robb and wife, C. J. Craggs, trustee, and the Cleveland State Bank. The prayer of the bill sought: (1) cancellation of a deed, which had previously been executed to C. F. Black, and subsequent conveyances to the other defendants, resting thereon; and (2) an accounting for rents. The answer denied all the material allegations. On the hearing, the court declined to grant any relief, but instead, dismissed the bill. From the decree entered, I. T. Black appeals.

The case grew out of this situation: I. T. Black and C. F. Black were father and son respectively. In 1934, the father owned certain real estate in the city of Cleveland. A house was erected thereon, both contributing labor and money for this purpose. Upon completion it was valued at from $1200.00 to $1400.00. The son moved into the house and lived there continuously. At the trial, they disagreed concerning their respective rights.

On August 11, 1941, the father's sister died. A fuss occurred between the father's daughter and Mrs. C. F.

Black. The next day, the father indicated to the son that the latter would have to move, and the son informed the father that their business relations would cease. Negotiations were opened by the son to purchase his father's interest in the property involved. The father's first offer was $1000.00, but later he reduced his asking price to $800.00. The son procured a loan for that amount, the deed was executed and delivered, and the consideration paid. This occurred September 5, 1941.

Thereafter on September 14, 1941, the father, who lived on the adjacent lot, desired to connect to his son's sewage line. A dispute arose, the father became irate, made threats, and exhibited a deadly weapon. He was taken into custody by the officers, and, on the following day, was adjudged insane and sent to the mental institution at Whitfield. After several weeks, he was permitted to return to his home. Later in the year, he went back to the institution for several days. Finally on April 18, 1942, an order was entered by the chancery court adjudging him to be not insane but normal in every way.

The sole question in this case was one of fact. The father's contention was that he was insane at the time of the execution of the deed, whereas the defense was that the father was sane and normal.

The father's evidence was to the effect that he was so upset by the above-mentioned fuss, and the notice from his son that their business relations would cease, that he was completely deranged; that he knew nothing about what transpired from that time until he was finally discharged from the institution; and that his whole experience over this period was like a dream. He introduced a doctor from the staff of the institution, who testified that Mr. Black had a psychosis with cerebral arteriosclerosis—a form of insanity caused by the hardening of the tiny arteries in the brain; that some of this existed on September 5, 1941; and that, in his opinion, Black did not know and was not accountable for what he

did at that time. However, a copy of all the records in the case was introduced in evidence, and it was susceptible of the conclusion that there was not complete unanimity among the staff.

On the contrary, a large number of witnesses, for the defendant, composed of a son, daughter, former wife, son-in-law, relatives, and others of longstanding acquaintance, testified to this effect: They had never suspected insanity—Mr. Black was not crazy—but, instead, he was perfectly normal and sane. He was a drinking man on week-ends, but he was not drinking before, at the time of, or for a day or two after the execution of the deed. A daughter testified that he visited her the next day, talked to her about the sale, and seemed highly pleased. The evidence was also to the effect that everything went along smoothly until September 14, 1941, when Mr. Black, who was said to be high-tempered and tyrannical toward his family, became enraged at his son's refusal of permission for the sewage connection. The reason for sending him to Whitfield was to treat him for his liquor habit. The daughter testified that on the third day after his admission to the hospital, he told her that he lost his temper and was sorry for what he did. There was evidence that he said he was going to play crazy and get his property back. Besides, the banker testified that Mr. Black indorsed the check of $800.00 and drew the money in cash; that he deposited $405.00 on September 15th, and subsequently, over a period of about two months, he drew this money out of the bank by divers and sundry checks.

In other words, there was a sharp dispute on all of the material facts of the case.

The appellant argues that, even though the defendants introduced a large number of witnesses, yet the decree is contrary to the great weight of the evidence, for the reason that the worth of the evidence of the expert from Whitfield far outweighed that of lay witnesses.

 That lay witnesses may testify on an issue such as was presented in this case is so elemental that the citation of authority is not necessary. Moreover,  this was not such an issue beyond the range of experience or observation of laymen as to require the acceptance of evidence by a reputable expert to the exclusion of lay testimony. Kramer Service, Inc., v. Wilkins, 184 Miss. 483, 186 So. 625.

Affirmed.